FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

05 NOV 14 AM 11: 44

OFFICE OF THE CLERK

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES, PLAINTIFF, and the ) | |
| STATE OF NEBRASKA Plaintiff-Intervenor, ) | Civil Action Number: *8:05 cv 418* |
| v. ) | |
| AGP CORN PROCESSING, INC. Defendant. ) | |

## CONSENT DECREE

# TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ................................................................ 2

II.     APPLICABILITY ................................................................................... 3

III.    FACTUAL BACKGROUND ................................................................... 4

IV.     COMPLIANCE PROGRAM .................................................................. 5

        A.      INSTALLATION OF
                CONTROLS............................................................................5

        B.      PERMITTING AND MODIFICATIONS ............................... 6

        C.      EMISSION LIMITS................................................................9

        D.      DEMONSTRATION OF COMPLIANCE............................12

        E.      RECORDKEEPING AND REPORTING ........................... 13

V.      CIVIL PENALTY ................................................................................ 14

VI.     STIPULATED PENALTIES ................................................................ 16

VII     RIGHT OF ENTRY ............................................................................. 18

VIII.   FORCE MAJEURE ............................................................................. 19

IX.     DISPUTE RESOLUTION ................................................................... 21

X.      GENERAL PROVISIONS ................................................................... 23

XI.     TERMINATION .................................................................................. 27

## CONSENT DECREE

WHEREAS, Plaintiff, the United States of America ("Plaintiff" or "the United States"), on behalf of the United States Environmental Protection Agency ("EPA"), has, simultaneously with lodging of this Consent Decree, filed a Complaint alleging that Defendant, AGP Corn Processing, Inc. ("AGP" or "Defendant") commenced construction of a major emitting facility and major modifications of its Hastings, Nebraska ethanol plant ("ethanol plant," as defined herein) a major emitting facility in violation of the Prevention of Significant Deterioration ("PSD") requirements at Part C of the Clean Air Act (the "Act"), 42 U.S.C. §§ 7470-7492, and the regulations promulgated thereunder at 40 C.F.R. § 52.21 (the "PSD Rules");

WHEREAS, Plaintiff further alleged that Defendant commenced construction of an emitting facility or modified an emitting facility without first obtaining the appropriate preconstruction permits and installing the appropriate air pollution control equipment required by 40 C.F.R. § 52.21 and the Nebraska State Implementation Plan ("SIP") approved pursuant to 42 U.S.C. § 7410;

WHEREAS, Plaintiff further alleged that potential air emissions from the Defendant's ethanol plant were underestimated;

WHEREAS, the State of Nebraska, through the Nebraska Department of Environmental Quality ("NDEQ" or "Plaintiff-Intervenor"), has, simultaneously with lodging of this Consent Decree, filed a Complaint in Intervention, alleging that AGP was and is in violation of the Nebraska SIP, by failing to obtain the appropriate pre-construction permits, by failing to accurately report emissions increases, and by failing to install appropriate pollution control technology, in violation of applicable state laws, including Nebraska Air Quality Regulations, Title 129, Chapters 18 and 19;

1

WHEREAS, the State of Nebraska issued a minor source construction permit to AGP for the construction of the ethanol plant in April 1995 and minor permit revisions were issued for the ethanol plant in September 1995, March of 1997, September of 1997 and December of 1998. The State of Nebraska issued an air construction permit for the expansion of the ethanol plant in July 1999;

WHEREAS, AGP Corn Processing, Inc. is a Nebraska corporation, incorporated in May 1995, and is a wholly owned subsidiary of Ag Processing Inc a cooperative;

WHEREAS, AGP has worked cooperatively with EPA and NDEQ regarding the alleged violations and voluntarily provided requested information without information requests under Section 114 of the Act, 42 U.S.C. § 7414;

WHEREAS, the Defendant does not admit the violations alleged in the Complaints;

WHEREAS, the United States and Plaintiff-Intervenor (collectively "Plaintiffs"), and the Defendant have agreed that settlement of this action is in the best interest of the parties and in the public interest, and that entry of this Consent Decree without further litigation is the most appropriate means of resolving this matter; and

WHEREAS, Plaintiffs and the Defendant consent to entry of this Consent Decree without trial of any issues;

NOW, THEREFORE, without any admission of fact or law, and without any admission of the violations alleged in the Complaints, it is hereby ORDERED AND DECREED as follows:

## I. JURISDICTION AND VENUE

1.     The Complaints state a claim upon which relief can be granted against the Defendant under Sections 113 and 167 of the Act, 42 U.S.C. §§ 7413 and 7477, and 28 U.S.C. §

2

1355.  This Court has jurisdiction of the subject matter herein and over the parties consenting

hereto pursuant to 28 U.S.C. § 1345 and pursuant to Sections 113 and 167 of the Act, 42 U.S.C.

§§ 7413 and 7477.  Venue is proper under Section 113(b) of the Act, 42 U.S.C. § 7413(b), and

under 28 U.S.C. § 1391(b) and (c).

## II.  APPLICABILITY

2.      The provisions of this Consent Decree shall apply to and be binding upon the

Plaintiffs and upon the Defendant as well as the Defendant's officers, employees, agents,

successors and assigns.  In the event Defendant proposes to sell or transfer the ethanol plant

(defined herein at Paragraph 3(b)) subject to this Consent Decree before termination of the

Consent Decree, it shall advise such proposed purchaser or successor-in-interest in writing of the

existence of this Consent Decree, and shall send a copy of such written notification by certified

mail, return receipt requested, to the EPA Regional Administrator for Region VII before such

sale or transfer, if possible, but no later than the closing date of such sale or transfer.  The

Defendant shall provide a copy of the Consent Decree and the Control Technology Plan required

in Paragraph 4 of this Consent Decree to the proposed purchaser or successor-in-interest.  In the

event the Defendant sells or otherwise assigns any of its right, title, or interest in the ethanol

plant, prior to termination of the Consent Decree, the conveyance shall not release the Defendant

from any obligation imposed by this Consent Decree unless the party to whom the right, title or

interest has been transferred agrees in writing to fulfill the obligations of this Consent Decree.

Nothing in this Consent Decree shall prevent Defendant from permanently discontinuing

operations at its ethanol plant.  If Defendant elects to permanently discontinue its operations at

the ethanol plant, it shall notify Plaintiffs and this Court in accordance with the Termination

provisions in Part XI of this Consent Decree.

3

## III. FACTUAL BACKGROUND AND APPLICABLE DEFINITIONS

3. (a). AGP is a "person" as defined in Section 302(e) of the Act, 42 U.S.C. § 7602(e), and the federal and state regulations promulgated pursuant to the Act.

(b). AGP owns and operates a plant in Hastings, Nebraska, for the manufacture of ethanol ("ethanol plant"). The ethanol plant is a separate facility and does not include the Ag Processing Inc., Hastings, Nebraska soy bean processing plant and vegetable oil refinery located adjacent to the ethanol plant. This Consent Decree does not apply to the soy bean plant and vegetable oil refinery. AGP receives whole corn and milo which is then milled, heated, and fermented. After fermentation, the raw product is distilled to produce ethanol. Distillation separates the liquid ethanol from the corn meal, which AGP may dry or sell as wet mash for animal feed. The Plaintiffs allege that in the course of these manufacturing activities significant quantities of particulate matter ("PM"), particulate matter at or below 10 microns ("$PM_{10}$"), carbon monoxide ("CO"), volatile organic compounds ("VOCs"), nitrogen oxides ("NOx"), sulfur dioxide ("$SO_2$") and other pollutants are generated, including hazardous air pollutants ("HAPs") listed under Section 112(b)(1), 42 U.S.C. § 7412(b)(1) of the Act. The primary sources of these emissions are the feed dryers, fermentation units, gas boilers, cooling cyclones, ethanol load-out systems, and the fugitive emissions from the facility operations, including roads.

(c). Plaintiffs allege that the AGP ethanol plant in Hastings, Nebraska is a "major emitting facility," as defined by Section 169(1) of the Act, 42 U.S.C. § 7479(1), and the federal and state regulations promulgated pursuant to the Act.

4

(d).  Definitions:  Unless otherwise defined herein, terms used in this Consent Decree shall have the meaning given to those terms in the Act, and the federal and state regulations promulgated pursuant to the Act.

## IV.  PERMITTING AND TECHNOLOGY REQUIREMENTS

AGP shall implement a program of compliance at the ethanol plant to attain the emission levels required under this Consent Decree for VOC, PM, $PM_{10}$, CO, $SO_2$ and NOx.

A.  INSTALLATION OF CONTROLS AND APPLICABLE EMISSION LIMITS

4.  AGP shall implement a plan for the installation of air pollution control technology ("Control Technology Plan") capable of meeting the following emission level reductions for the identified units in subparagraphs (a) through (h).  AGP's Control Technology Plan, which has been approved by Plaintiffs, is Attachment 1 to this Consent Decree:

(a).  DDGS Dryers:  95 percent reduction of VOC or emissions no higher than 10 parts per million ("PPM") of VOC, 90 percent reduction of CO emissions or emissions no higher than 100 PPM of CO, and reduction of PM and $PM_{10}$ based on operation of pollution control technology specified in the approved Control Technology Plan and as established after initial performance testing pursuant to this Consent Decree.  A NOx emission factor shall be established after initial performance testing required pursuant to this Consent Decree.  The emission factor will be used to determine compliance with a Group NOx emission cap using the method specified in the approved Control Technology Plan.

(b).  Fermentation Units (including the Beer Well):  95 percent reduction of VOC or equal to or less than 20 PPM of VOC.  Alternative Scenario: If the exhaust from the Fermentation Units is routed to an RTO, 95 percent reduction of VOC or emissions no more higher than 10 PPM of VOC.

(c).  Distillation Units (Misc. Process Vent):  95 percent reduction of VOC or emissions no higher than 10 PPM of VOC.

5

(d)   Additional Requirements for NOx Emission Units: A group
NOx cap emission limit shall not exceed 86.9 TPY NOx for the
boilers, and DDGS dryers.   Emission factors for each unit in this
group shall be established during the initial performance test
required by this Consent Decree and will be used to calculate
compliance, based on actual fuel usage for all emissions units in
this group as described in the approved Control Technology Plan.

(e).   Cooling Cyclone:  VOC and $PM/PM_{10}$ emission limits shall
be established based on data collected from performance testing
required by this Consent Decree.

(f).   Ethanol Loadout: Railcar and Truck loadout:  Install an
enclosure for the total capture of VOC's and operate a closed loop
system vented to a flare for the destruction of captured VOC's.

(g).   New Source Performance Standards (NSPS): AGP shall be
subject to and comply with the following NSPS requirements
codified at 40 C.F.R. Part 60:  NSPS subpart Kb (Volatile Organic
Liquid Storage Vessels); and NSPS subpart VV (Synthetic Organic
Chemicals Manufacturing Industry Leak Detection, Monitoring
and Repair Requirements).  The following three tanks are subject
to NSPS subpart Kb: EP13A, EP13B, and EP16.

(h)   Fugitive Dust (PM/PM10) Control:  The program described
in the approved Control Technology Plan shall be implemented to
minimize fugitive dust emissions from facility paved traffic routes.

5.   AGP shall implement the approved Control Technology Plan in accordance with

the schedule set forth in that plan.  AGP's approved Control Technology Plan is incorporated by

reference herein and made directly enforceable by Plaintiffs under this Consent Decree.

B.   PERMITTING AND MODIFICATIONS

6.   By no later than 90 days of lodging of the Consent Decree, AGP shall submit an

application for a modification to its existing Neb. Admin. Code Title 129 Construction permit.

AGP shall include in its application, and NDEQ shall incorporate, the emission limits,

6

monitoring and recordkeeping requirements of the approved Control Technology Plan and this

Consent Decree into any existing or new permit issued to the ethanol plant and such emission

limits, monitoring and recordkeeping requirements shall remain applicable to the ethanol plant

for the life of its operation or until changed through a permit amendment.  AGP shall not contest

any permit terms that it applies for pursuant to this Consent Decree.  Requirements under this

Consent Decree excluded under this Paragraph are NSPS Subparts, Kb, and VV, referenced in

Paragraph 4(g).  In addition, the Consent Decree shall be referenced in the permit as the legal

basis for all applicable requirements created by the Consent Decree.

7.  By no later than one hundred eighty (180) days following start-up of the last piece of

control equipment required by this Consent Decree, AGP shall apply for modification to its

federally enforceable permits to incorporate those emission limits, monitoring parameters, and

recordkeeping set forth in this Consent Decree that have not already been incorporated into the

appropriate permits as required in Paragraph 6.

8.  Future Modifications:  For the effective period of the Consent Decree, AGP shall

obtain a construction permit under Neb. Admin. Code Title 129, Chapter 19,  prior to beginning

construction or operation of any future modification that will result in a significant net emission

increase as defined by 40 C.F.R. Part 52 (as in effect on the date of the beginning of

construction) but will not exceed the 95 TPY allowable emission caps.  The modifications

required in Part IV Section A ("Installation of Controls and Applicable Emission Limits") and

the approved Control Technology Plan of this Consent Decree are excluded from the

requirements of this Paragraph.  For purposes of determining whether a modification will result

in a significant net emissions increase, AGP shall use emission factors established in its initial

7

performance testing, as required by Paragraph 19, to determine their past actual emissions baseline.

9.     If, as a result of any future modifications, prior to termination of the Consent Decree, the total limited potential emissions of VOCs, PM, $PM_{10}$, $SO_2$, $NO_X$ and CO will exceed the 95 TPY allowable emission caps, then AGP shall complete and submit for NDEQ approval a source-wide PSD/NSR permit application that includes the approved Control Technology Plan requirements as set forth in this Consent Decree.  To the extent that AGP demonstrates, through results of performance tests or evidence of operating conditions, that the ethanol plant has operated below the 95 TPY emission caps for twenty-four (24) months, the ethanol plant shall be treated as a synthetic minor for air permitting requirements and permit requirements for future modifications will be governed by applicable state and federal regulations.

10.     Termination of the Consent Decree, shall not relieve AGP of any obligations to obtain necessary permits or permit amendments, as may be required under applicable state and federal regulations.

11.     In determining whether a future modification will result in a significant net emissions increase, AGP cannot take credit for any emission reductions resulting from the implementation of the approved Control Technology Plan for netting purposes as defined by 40 C.F.R. § 52.21(b)(3).  In addition, the emission reductions of PM, $PM_{10}$, $NO_x$, $SO_2$ and CO required under this Consent Decree and the applicable NSPS may not be used for any emissions offset, banking, selling or trading program.  VOC emissions reductions up to 98 percent of the uncontrolled feed dryer emissions may not be used for any emissions offset, banking, selling or trading program.

C. EMISSION LIMITS

8

12.     Unit Emission Limits for DDGS Dryers, Fermentation Units, Distillation Unit,
Boilers, Ethanol Truck Loadout: AGP shall install the air pollution control technology in
accordance with the schedule contained in the approved Control Technology Plan capable of
meeting the emission level reductions for the identified units in Paragraph 4. Beginning no later
than one hundred eighty (180) days following the start-up of each piece of control equipment
required in its approved Control Technology Plan, AGP shall continually operate each unit in
accordance with the operating parameters set forth in the approved Control Technology Plan.

13. Interim Controls for DDGS Dryers and Distillation Units (Misc. Process Vent): AGP
shall continually operate the existing water scrubber on the DDGS dryers and the Distillation
Units to achieve maximum reduction of VOC and $PM/PM_{10}$ until beginning installation and
operation of the control equipment required in its approved Control Technology Plan.

14.     Unit Emission Limit for Cooling Cyclone: By no later than forty-five (45) days
following the initial performance test of the control equipment for the cooling cyclone as
required in Paragraphs 4(e) and 19, AGP shall propose VOC and $PM/PM_{10}$ emission limits for
the cooling cyclone based on the data collected from initial performance testing and other
available pertinent information. After proposing its limits under this Paragraph, AGP shall
immediately comply with the proposed emission limits. After AGP proposes these emission
limits, EPA and NDEQ will use the data collected and other available pertinent information to
establish limits for VOC and $PM/PM_{10}$. Upon written notice to AGP by EPA and NDEQ, the
established limits shall be incorporated into and enforceable under this Consent Decree. If the
limits established by EPA and NDEQ are more stringent than the limits proposed by AGP, then
AGP shall have sixty (60) days from the date of written notice to comply with the established
limits. If AGP contests the EPA/NDEQ's proposed limits, AGP shall have sixty (60) days from

9

the date of the written notice to invoke the Dispute Resolution process pursuant to Part IX

("Dispute Resolution") and obtain a stay from the Court.  If AGP elects to invoke the Dispute

Resolution process, AGP shall continue to comply with the emission limits it proposed under

this Paragraph, until written notification that a different limit is established under the Dispute

Resolution process herein.

15.    Group NOx Cap:  Following the initial performance test required in Paragraph 19,

AGP shall establish unit specific NOx emission factors that it will use to calculate actual NOx

emissions to demonstrate compliance with Paragraph 4(d).  The method to determine compliance

with the limit in Paragraph 4(d) is specified in the approved Control Technology Plan.

Beginning no later than one hundred eighty (180) days following the date of the initial

performance tests for the boilers and the dryers, AGP shall continually operate the ethanol plant

so as not to exceed the group NOx emission cap of 86.9 TPY for NOx based on a 12-month

rolling sum, rolled monthly, and recorded monthly according to the equation in the approved

Control Technology Plan.  For the first eleven (11) months compliance with the 12-month

rolling sum will be demonstrated based on  the schedule as set forth in the approved Control

Technology Plan.  This provision shall survive termination of this Consent Decree until the 86.9

TPY emission cap is amended by or incorporated into a federally-enforceable permit for the

ethanol plant.  If any of the emission units subject to the Group NOx cap are shutdown, the 86.9

TPY Group NOx cap shall be reduced by the following corresponding amounts: 1) Boiler #1 -

35.0 TPY; 2) Boiler #2 - 35.0 TPY; 3) Dryer #1 - 8.4 TPY; and 4) Dryer #2 - 8.4 TPY.

16.    PM and $PM_{10}$ Emission Limit for DDGS Dryers:  By no later than forty-five (45)

days following the initial performance test of the control equipment for the DDGS dryers as

required in Paragraphs 4(a) and 19, AGP shall propose PM and $PM_{10}$ emission limits for the

10

DDGS dryers based on the data collected from initial performance testing and other available pertinent information. AGP shall immediately comply with the proposed emission limit. EPA and NDEQ will use the data collected and other available pertinent information to establish limits for PM and $PM_{10}$. EPA and NDEQ shall provide written notice to AGP of the established limit and the established limit shall be incorporated into and enforceable under this Consent Decree. If the limit established by EPA and NDEQ is more stringent than the limit proposed by AGP, then AGP shall have sixty (60) days from the date of written notice to comply with the established limit. If AGP contests the limit proposed by EPA and NDEQ, AGP shall have sixty (60) days from the date of written notice by EPA and NDEQ to invoke the Dispute Resolution process pursuant to Part IX ("Dispute Resolution") and obtain a stay from the Court. If AGP elects to invoke the Dispute Resolution process, AGP shall comply with the emission limit it proposed under this Paragraph, until written notification that a different limit is established under the Dispute Resolution process herein.

17. <u>Source-wide Caps</u>: AGP shall accept source-wide allowable emission caps equivalent to 95 tons per year ("TPY"), for each pollutant, VOCs, PM, $PM_{10}$, $SO_2$, $NO_X$, and CO, for a period of twenty-four months or until termination of this Consent Decree whichever is later. Beginning no later than one hundred eighty (180) days following start-up of the last piece of control equipment required in the approved Control Technology Plan, AGP shall continually operate the ethanol plant so as not to exceed the source-wide allowable emission caps of 95 TPY for each pollutant VOCs, PM, $PM_{10}$, $SO_2$, $NO_X$, and CO, based on a 12-month rolling sum, rolled monthly, and recorded monthly. For the first eleven months, beginning no later than one hundred eighty (180) days following start-up of the last piece of control equipment required in the approved Control Technology Plan, compliance with the 12-month rolling sum will be

11

demonstrated based on a schedule to meet applicable emission caps as set forth in the approved
Control Technology Plan.

     D.  UNDERLINE DEMONSTRATION OF COMPLIANCE

     18.    AGP shall demonstrate continuous compliance with the emission limits
established under this Consent Decree by the use of performance testing, parametric monitoring,
recordkeeping and reporting, as appropriate, as set forth in the approved Control Technology
Plan.  Until Termination of this Consent Decree, AGP shall conduct annual performance tests on
the sources and using the methods set forth in Section 7.0 of the approved Control Technology
Plan to demonstrate compliance with the emission limits therein unless this requirement is
waived in writing by NDEQ and EPA.

     19.    By no later than one hundred twenty (120) days of startup of the Regenerative
Thermal Oxidizer (RTO), AGP shall demonstrate through an initial performance test that it has
met the required destruction efficiency and/or emission limit for the RTO as specified in the
approved Control Technology Plan.  By no later than one hundred twenty (120) days following
the start-up of the last piece of the remaining control equipment (the scrubber, two boilers,
cooling cyclone, and the railcar/truck loadout flare) required in the approved Control
Technology Plan, AGP shall demonstrate through an initial performance test that it has met the
required destruction efficiency and/or emission limit of each emissions unit as specified in the
approved Control Technology Plan.

     20.    All performance testing protocol shall be submitted to NDEQ and EPA for review
at least thirty (30) days prior to testing.  The performance testing shall be conducted in

accordance with EPA approved test protocol. Within forty-five (45) days of the test date, test results reports shall be submitted for review to NDEQ and EPA.

21.     AGP shall maintain control technology performance criteria monitoring data and records as set forth in the approved Control Technology Plan, and shall make them available to the Plaintiffs as soon as practicable after demand by Plaintiffs.

E.  RECORDKEEPING AND REPORTING REQUIREMENTS

22.     Beginning with the first full calendar quarter following lodging of this Consent Decree, AGP shall submit written reports within thirty (30) days following each calendar quarter to NDEQ and EPA that itemize Consent Decree requirements and the approved Control Technology Plan requirements, the applicable deadlines, the dates the tasks were completed, unit emissions data and data to support AGP's compliance status with the terms of this Consent Decree. Reports shall be sent to the addresses identified in Paragraph 57 ("Notice"). Emissions data may be submitted in electronic format.

23.     AGP shall maintain records to demonstrate compliance with New Source Performance Standards ("NSPS"), 40 C.F.R., Part 60, Subparts Kb, and VV, and its fugitive dust emission control plan as described in the approved Control Technology Plan.

24.  AGP shall maintain records to demonstrate compliance with the source wide caps required under Paragraph 17, and other emission limits contained in the permit issued pursuant to Paragraphs 6 or 7 of this Consent Decree.

25.     AGP shall preserve and retain all records and documents now in its possession or control, or which come into its possession or control, that support the  reporting and compliance

13

requirements under this Part for a period of three years following the termination of this Consent

Decree, unless other regulations require the records to be maintained longer.

26. All permit applications, test reports, quarterly reports and other written reports from

AGP required under this Consent Decree, shall contain the following certification and shall be

signed by an official of the company responsible for environmental management and

compliance:

> "I certify under penalty of law that I have personally examined the
> information submitted herein and that I have made a diligent
> inquiry of those individuals immediately responsible for obtaining
> the information and that to the best of my knowledge and belief,
> the information submitted herewith is true, accurate, and complete.
> I am aware that there are significant penalties for submitting false
> information, including the possibility of fine and imprisonment."

## V. CIVIL PENALTY

27. Within thirty (30) calendar days of entry of this Consent Decree, the Defendant shall

pay to the Plaintiffs a civil penalty pursuant to Section 113 of the Act, 42 U.S.C. § 7413, in the

amount of $40,000 ( Forty Thousand Dollars). Pursuant to the Act, the following factors were

considered in determining a civil penalty, in addition to other factors as justice may require, the

size of the business, the economic impact of the penalty on the business, the violator's full

compliance history and good faith efforts to comply, the duration of the violation, payment by

the violator of penalties previously assessed for the same violation, the economic benefit of

noncompliance, and the seriousness of the violation.

28. Of the total penalty, $20,000 (Twenty Thousand Dollars), shall be paid to the

14

United States by Electronic Funds Transfer ("EFT") to the United States Department of Justice,

in accordance with current EFT procedures, referencing the USAO File Number and DOJ Case

Number 90-5-2-1-08119, and the civil action case name and case number of the District of

Nebraska. The costs of such EFT shall be AGP's responsibility. Payment shall be made in

accordance with instructions provided to AGP by the Financial Litigation Unit of the U.S.

Attorney's Office in the District of Nebraska. Any funds received after 11:00 a.m. (EST) shall

be credited on the next business day. AGP shall provide notice of payment, referencing the

USAO File Number and DOJ Case Number 90-5-2-1-08119, and the civil action case name and

case number, to the Department of Justice and to EPA, as provided in Paragraph 57 ("Notice").

The total remaining amount, $20,000 (Twenty Thousand Dollars) in civil penalties, shall be paid

to the Plaintiff-Intervenor the State of Nebraska. Payment to the Plaintiff-Intervenor the State of

Nebraska shall be made in the form of a certified check payable to the "Adams County

Treasurer, Adams County, Nebraska" and mailed to:

> Jodi M. Fenner
> Assistant Attorney General
> 2115 State Capitol Building
> Post Office Box 98920
> Lincoln, Nebraska 68509-8920

29.     The Defendant shall pay statutory interest on any over due civil penalty or

stipulated penalty amount at the rate specified in 31 U.S.C. § 3717. Upon entry of this Consent

Decree, this Consent Decree shall constitute an enforceable judgment for purposes of post-

judgment collection in accordance with Rule 69 of the Federal Rules of Civil Procedure, the

Federal Debt Collection Procedure Act, 28 U.S.C. § 3001-3308, and other applicable federal and

15

state authority. The Plaintiffs shall be deemed a judgment creditor for purposes of collection of any unpaid amounts of the civil and stipulated penalties and interest.

30.     No amount of the civil penalty to be paid by AGP shall be used to reduce its federal or state tax obligations.

## VI. STIPULATED PENALTIES

31.     If demanded in writing by EPA and NDEQ under Paragraph 32, the Defendant shall pay stipulated penalties in the amounts set forth below to the Plaintiffs, to be paid 50 percent to the United States and 50 percent to the Plaintiff-Intervenor, for the following:

(a).     for each day of failure to propose VOC, PM, and $PM_{10}$ emission limits under Paragraphs 14 and 16:

| | |
|---|---|
| 1st through 30th day after deadline | $ 250 |
| 31st through 60th day after deadline | $500 |
| Beyond the 60th day | $1000 |

(b).     for each day of failure to meet the deadlines for installation of control technology systems set forth in the Control Technology Plan and for failure to apply for permits under Paragraphs 6 and 7:

| | |
|---|---|
| 1st through 30th day after deadline | $800 |
| 31st through 60th day after deadline | $1,200 |
| Beyond 60th day | $2,000 |

(c).     for failure to conduct a performance test as required by Paragraphs 18 and 19, per day per unit:

| | |
|---|---|
| 1st through 30th day after deadline | $250 |

16

| | |
|---|---|
| 31st through 60th day after deadline | $500 |
| Beyond 60th day | $1,000 |

(d).      for failure to demonstrate compliance with emission limits set forth in the approved Control Technology Plan or emission limits established pursuant to Part IV Section C ("Emission Limits"):  $5000 per emissions test for each pollutant.

(e).      for each failure to submit reports or studies as required by Part IV Section E ("Recordkeeping and Reporting Requirements") of this Consent Decree, per day per report or notice:

| | |
|---|---|
| 1st through 30th day after deadline | $250 |
| 31st through 60th day after deadline | $500 |
| Beyond 60th day | $1,000 |

(f).      for failure to pay or escrow stipulated penalties, after written demand from either EPA or NDEQ, as specified in Paragraphs 32 and 33 of this section, $500 per day after such demand per penalty demand.

(g).      for failure to notify the Plaintiffs pursuant to Paragraph 2 of AGP's sale or transfer of the ethanol plant, $250 per day.

32.      AGP shall pay stipulated penalties upon written demand by the Plaintiffs no later than thirty (30) days after Defendant receives such demand.  Stipulated penalties shall be paid to the Plaintiffs in the manner set forth in Part V ("Civil Penalty") of this Consent Decree.

33.      Should AGP dispute its obligation to pay part or all of a stipulated penalty, it may avoid the imposition of the stipulated penalty for failure to pay a penalty due to the Plaintiffs by placing the disputed amount demanded by the Plaintiffs, not to exceed $20,000 for any given

17

event or related series of events, in a commercial escrow account pending resolution of the matter and by invoking the Dispute Resolution provisions of Part IX within the time provided in Paragraph 32 for payment of stipulated penalties. If the dispute is thereafter resolved in Defendant's favor, the escrowed amount plus accrued interest shall be returned to the Defendant. Otherwise the Plaintiffs shall be entitled to the escrowed amount that was determined to be due by the Court plus the interest that has accrued on such amount, with the balance, if any, returned to the Defendant.

34.     The Plaintiffs reserve the right to pursue any other remedies for violations of this Consent Decree to which they are entitled. The Plaintiffs will not seek both stipulated penalties and civil or administrative penalties authorized under the Clean Air Act and the Nebraska Environmental Protection Act for the same violation of the Consent Decree.

## VII. RIGHT OF ENTRY

35.     Any authorized representative of the EPA or NDEQ, or an appropriate federal or state agency, including independent contractors, upon presentation of proper credentials and in compliance with the facility's safety requirements, shall have a right of entry upon the premises of AGP's ethanol plant identified herein at Paragraph 3(b) at any reasonable time for the purpose of monitoring compliance with the provisions of this Consent Decree, including inspecting plant equipment, and inspecting and copying all records maintained by Defendant required by this Consent Decree. Nothing in this Consent Decree shall limit the authority of EPA and NDEQ to conduct tests and inspections under Section 114 of the Act, 42 U.S.C. § 7414, and or any other applicable federal or state law.

## VIII. FORCE MAJEURE

18

36.    If any event occurs which causes or may cause a delay or impediment to performance in complying with any provision of this Consent Decree, Defendant shall notify the Plaintiffs in writing as soon as practicable, but in any event within twenty (20) business days of when Defendant first knew of the event or should have known of the event by the exercise of due diligence. In this notice Defendant shall specifically reference this Paragraph of this Consent Decree and describe the anticipated length of time the delay may persist, the cause or causes of the delay, and the measures taken or to be taken by Defendant to prevent or minimize the delay and the schedule by which those measures will be implemented. Defendant shall adopt all reasonable measures to avoid or minimize such delays.

37.    Failure by Defendant to provide notice to Plaintiffs of an event which causes or may cause a delay or impediment to performance shall render this Part VIII voidable by the Plaintiffs as to the specific event for which the Defendant has failed to comply with such notice requirement, and, if voided, is of no effect as to the particular event involved.

38.    EPA and NDEQ shall notify the Defendant in writing regarding the Defendant's claim of a delay or impediment to performance as soon as practicable, but in any event within thirty (30) days of receipt of the Force Majeure notice provided under Paragraph 36. If the Plaintiffs agree that the delay or impediment to performance has been or will be caused by circumstances beyond the control of the Defendant, including any entity controlled by the Defendant, and that the Defendant could not have prevented the delay by the exercise of due diligence, the parties shall stipulate to an extension of the required deadline(s) for all requirement(s) affected by the delay by a period equivalent to the delay actually caused by such

19

circumstances. The Defendant shall not be liable for stipulated penalties for the period of any such delay.

39.     If the Plaintiffs do not accept the Defendant's claim that a delay or impediment to performance is caused by a force majeure event, to avoid payment of stipulated penalties, the Defendant must submit the matter to this Court for resolution within twenty (20) business days after receiving notice of the Plaintiffs' position, by filing a petition for determination with this Court. Once the Defendant has submitted this matter to this Court, the Plaintiffs shall have twenty (20) business days to file its response to said petition. If the Defendant submits the matter to this Court for resolution and the Court determines that the delay or impediment to performance has been or will be caused by circumstances beyond the control of the Defendant, including any entity controlled by the Defendant, and that the Defendant could not have prevented the delay by the exercise of due diligence, the Defendant shall be excused as to that event(s) and delay (including stipulated penalties), for a period of time equivalent to the delay caused by such circumstances.

40.     The Defendant shall bear the burden of proving that any delay of any requirement(s) of this Consent Decree was caused by or will be caused by circumstances beyond its control, including any entity controlled by it, and that the Defendant could not have prevented the delay by the exercise of due diligence. The Defendant shall also bear the burden of proving the duration and extent of any delay(s) attributable to such circumstances. An extension of one compliance date based on a particular event may, but does not necessarily, result in an extension of a subsequent compliance date or dates.

20

41.     Unanticipated or increased costs or expenses associated with the performance of the Defendant's obligations under this Consent Decree shall not constitute circumstances beyond the control of the Defendant, or serve as a basis for an extension of time under this Part. However, failure of a permitting authority to issue a necessary permit in a timely fashion is an event of Force Majeure where the Defendant has taken all steps available to it to obtain the necessary permit including but not limited to:

(a).     submitting a timely and complete permit application;

(b).     responding to requests for additional information by the permitting authority in a timely fashion; and

(c).     diligently prosecuting any appeals of any disputed terms and conditions imposed by the permitting authority.

42.     As part of the resolution of any matter submitted to this Court under this Part VIII, the parties by agreement, or this Court, by order, may in appropriate circumstances extend or modify the schedule for completion of work under this Consent Decree to account for the delay in the work that occurred as a result of any delay or impediment to performance agreed to by the Plaintiffs or approved by this Court. Defendant shall be liable for stipulated penalties for its failure thereafter to complete the work in accordance with the extended or modified schedule.

IX. DISPUTE RESOLUTION

43.     The dispute resolution procedure provided by this Part IX shall be available to resolve all disputes arising under this Consent Decree, including but not limited to emission limits established by the NDEQ in Part IV Section C ("Emission Limits"), except as otherwise provided in Part VIII regarding Force Majeure.

21

44.     The dispute resolution procedure required herein shall be invoked upon the giving of written notice by one of the parties to this Consent Decree to another advising of a dispute pursuant to this Part IX. The notice shall describe the nature of the dispute, and shall state the noticing party's position with regard to such dispute. The party receiving such a notice shall acknowledge receipt of the notice and the parties shall expeditiously schedule a meeting to occur not later than fourteen (14) days from the receipt of such notice to discuss the dispute informally.

45.     Disputes submitted to dispute resolution shall, in the first instance, be the subject of informal negotiations between the parties. Such period of informal negotiations shall not extend beyond thirty (30) calendar days from the date of the first meeting between representatives of the Plaintiffs and the Defendant, unless the parties' representatives agree to shorten or extend this period.

46.     In the event that the parties are unable to reach agreement during such informal negotiation period, the Plaintiffs shall provide the Defendant with a written summary of their position regarding the dispute. The position advanced by the Plaintiffs shall be considered binding unless, within forty-five (45) calendar days of the Defendant's receipt of the written summary of the Plaintiffs position, the Defendant files with this Court a petition which describes the nature of the dispute, and includes a statement of the Defendant's position and any supporting data, analysis, and/or documentation relied on by the Defendant. The Plaintiffs shall respond to the petition within forty-five (45) calendar days of filing.

47.     Where the nature of the dispute is such that a more timely resolution of the issue is required, the time periods set out in this Part IX may be shortened upon agreement of the parties or by motion of one of the parties to the dispute.

22

48.     As part of the resolution of any dispute submitted to dispute resolution, the

parties, by agreement, or this Court, by order, may, in appropriate circumstances, extend or

modify the schedule for completion of work under this Consent Decree to account for the delay

in the work that occurred as a result of dispute resolution.  Defendant shall be liable for

stipulated penalties for its failure thereafter to complete the work in accordance with the

extended or modified schedule.

## X.  GENERAL PROVISIONS

49.     Effect of Settlement.  This Consent Decree is not a permit; compliance with its

terms does not guarantee compliance with any applicable federal, state or local laws or

regulations.  To the extent that the terms of this Consent Decree conflict with the terms of any

applicable  air construction or operating permit, the terms of this Consent Decree shall control

during the effective period of the Consent Decree.

50.     Resolution of Claims.  Satisfaction of all of the requirements of this Consent

Decree constitutes full settlement of and shall resolve all past civil and administrative liability of

the Defendant to the Plaintiffs for the violations alleged in the United States' and Plaintiff-

Intervenor's Complaints and all civil and administrative liability of the Defendant for any

violations at the ethanol plant based on or arising out of facts and events that occurred during the

relevant time period under the following statutory and regulatory provisions: (a) NSPS, 40

C.F.R. Part 60, including Subparts Kb, and VV; (b) PSD requirements at Part C of the Act and

the regulations promulgated thereunder at 40 C.F.R. § 52.21, (c) National Emission Standards

for Hazardous Air Pollutants, 40 C.F.R. Part 63, pursuant to Section 112(g) of the Clean Air Act;

and the Nebraska regulations which incorporate and/or implement the above-listed federal

23

regulations in items (a) through (c); including Nebraska Air Quality Regulations, Title 129, Chapters 5, 6, 7, 18, 19, 27 and 29. For purposes of this Consent Decree, the "relevant time period" shall mean the period beginning when the United States' claims and/or Plaintiff-Intervenor's claims under the above statutes and regulations accrued through the date of entry of this Consent Decree. During the effective period of the Consent Decree, certain emission units shall be on a compliance schedule and any modification to these units, as defined in 40 C.F.R. § 52.21, which is not required by this Consent Decree is beyond the scope of this resolution of claims. This provision shall survive the termination of the Consent Decree.

51.     Reservation of Specific Claims.  The release of liability granted by this Consent Decree under Paragraph 50 specifically excludes and Plaintiffs expressly reserve their rights pursuant to 40 C.F.R. § 52.21 (c), regarding ambient air increments. The release of liability specifically excludes and the State of Nebraska expressly reserves its rights pursuant to Neb. Rev. Stat. Section 81-1501 et seq. (Reissue 1999, Cum Supp. 2002, Supp 2003) of the Nebraska Environmental Protection Act with respect to the facts alleged in the NDEQ Notice of Violation addressed to AGP Corn Processing Inc. dated September 15, 2003 and March 16, 2004.

52.     Other Laws.  Except as specifically provided by this Consent Decree, nothing in this Consent Decree shall relieve Defendant of its obligation to comply with all applicable federal, state and local laws and regulations. Subject to Paragraph 50, nothing contained in this Consent Decree shall be construed to prevent or limit the United States' or NDEQ's rights to obtain penalties or injunctive relief under the Act or other federal, state or local statutes or regulations, including but not limited to, Section 303 of the Act, 42 U.S.C. § 7603.

24

53.    Third Parties.  Except as otherwise provided by law, this Consent Decree does not limit, enlarge or affect the rights of any party to this Consent Decree as against any third parties. Nothing in this Consent Decree should be construed to create any rights, or grant any cause of action, to any person not a party to this Consent Decree.

54.    Costs.  Each party to this Consent Decree shall bear its own costs and attorneys' fees through the date of entry of this Consent Decree.

55.    Public Documents.  All information and documents submitted by the Defendant to the Plaintiffs pursuant to this Consent Decree shall be subject to public inspection, unless subject to legal privileges or protection or identified and supported as business confidential by the Defendant in accordance with 40 C.F.R. Part 2 and any applicable Nebraska law.

56.    Public Comments - Federal Approval.  The parties agree and acknowledge that final approval by the United States and entry of this Consent Decree is subject to the requirements of 28 C.F.R. § 50.7, which provides for notice of the lodging of this Consent Decree in the Federal Register, an opportunity for public comment, and consideration of any comments.  The United States reserves the right to withdraw or withhold consent if the comments regarding this Consent Decree discloses facts or considerations which indicate that this Consent Decree is inappropriate, improper or inadequate.  The Defendant, Plaintiff, and the Plaintiff-Intervenor consent to the entry of this Consent Decree.

57.    Notice.  Unless otherwise provided herein, notifications to or communications with the United States, EPA, NDEQ or the Defendant shall be deemed submitted on the date they are postmarked and sent either by overnight receipt mail service or by certified or registered mail, return receipt requested.  Except as otherwise provided herein, when written notification to

25

or communication with the United States, EPA, NDEQ or the Defendant is required by the

terms of this Consent Decree, it shall be addressed as follows:

As to the United States:


Thomas L. Sansonetti
Assistant Attorney General
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611

As to the EPA:

Bill Peterson
EPA, Region 7
Air Permitting and Compliance Branch
901 North 5th Street
Kansas City, Kansas 66101

As to AGP:

Blake Hendrix
Vice President of Operations
Ag Processing Inc
12700 West Dodge Road
Omaha, NE 68154


As to Plaintiff-Intervenor the State of Nebraska, through the NDEQ:

Shelley Kaderly, Air Division Administrator
1200 N Street, Suite 400
Post Office Box 98922
Lincoln, NE 68509-8922


   58. <u>Change of Notice Recipient</u>.  Any party may change either the notice recipient or

the address for providing notices to it by serving all other parties with a notice setting forth such

26

new notice recipient or address.

59.     Modification.   There shall be no modification of this Consent Decree, without written agreement of all the parties.   There shall be no material modification of this Consent Decree without the written agreement of the parties and by Order of the Court.   Prior to complete termination of the requirements of this Consent Decree pursuant to Paragraph 61, the parties may, upon motion to the Court, seek to terminate individual provisions of this Consent Decree.

60.     Continuing Jurisdiction.   Until Termination pursuant to Section XI of this Consent Decree, the Court retains jurisdiction of this case after entry of this Consent Decree to enforce compliance with the terms and conditions of this Consent Decree and to take any action necessary or appropriate for its interpretation, construction, execution, or modification.   During the term of this Consent Decree, any party may apply to the Court for any relief necessary to construe or effectuate this Consent Decree.

## XI.  TERMINATION

61.     This Consent Decree shall be subject to termination upon motion by any party after the Defendant satisfies all requirements of this Consent Decree and has operated the control technologies identified in the approved Control Technology Plan in compliance with the emission limits, and has demonstrated for twenty-four (24) months that their actual emissions of VOCs, PM, $PM_{10}$, $SO_2$, NOx and CO from the ethanol plant have remained under 95 TPY.   For purposes of meeting the twenty-four (24) month performance requirement in this Paragraph, Defendant may demonstrate that actual emissions remained under the 95 TPY allowable emission caps by either using the results of their initial compliance tests or evidence of operating conditions since the installation of the control equipment required in this Consent Decree and in

27

the approved Control Technology Plan. At such time, if the Defendant is in compliance with the requirements of this Consent Decree, and has paid the civil penalty and any stipulated penalties required by this Consent Decree, then the Defendant shall so certify to the Plaintiffs and the Court, and unless the Plaintiffs object in writing with specific reasons within forty-five (45) days of receipt of the certification, the Court shall order that this Consent Decree be terminated on Defendant's motion. If the United States or NDEQ objects to the Defendant's certification, then the matter shall be submitted to the Court for resolution under Part IX ("Dispute Resolution") of this Consent Decree. In such case, the Defendant shall bear the burden of proving that this Consent Decree should be terminated.

62.     Nothing in this Consent Decree shall limit Defendant's right to permanently discontinue operations at the ethanol plant. If Defendant elects to permanently discontinue operations during the effective period of this Consent Decree, Defendant shall certify in writing to EPA and NDEQ that it intends to discontinue all operations at the ethanol plant within one hundred eighty (180) days of certification. Defendant shall pay all outstanding penalties due under Paragraph 27. Defendant shall pay all stipulated penalties that have been demanded in writing by EPA and NDEQ pursuant to Paragraphs 31, and 32. Defendant shall comply with all emission limitations and reporting requirements under this Consent Decree until cessation of all operations. Within ten (10) days after cessation of all operations, Defendant shall certify to EPA the last date of ethanol production and that all operations have ceased. Upon Defendant's notification to the Court and EPA and NDEQ of cessation of operations and payment of all outstanding penalties, this Consent Decree shall automatically terminate. Defendant agrees that it and any subsidiary, owner or affiliate of Defendant shall be permanently enjoined from

28

resuming ethanol production without applying for and obtaining major new source permits under

Nebraska Admin. Code Title 129.

Upon execution of this document, the original Consent Decree shall be returned to the

United States Attorney's Office and a copy of the Consent Decree shall be maintained in the

Clerk's Office.

So entered in accordance with the foregoing this _____10_____ day of _____November_____, 2005.


_____
United States District Court Judge
District of Nebraska


29

THE UNDERSIGNED enter into this Consent Decree in the matter of
United States et al. v. AGP Corn Processing, Inc.

FOR PLAINTIFF, UNITED STATES OF AMERICA:


Kelly A. Johnson                                    Date 8/8/05
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
10th & Pennsylvania Avenue, N.W.
Washington, DC 20530



Julie M. Van Horn                                   Date 25 August 2005
Special Department of Justice Appointment
Environment and Natural Resources Division
U.S. Department of Justice
10th & Pennsylvania Avenue, N.W.
Washington, DC 20530


30

THE UNDERSIGNED enter into this Consent Decree in the matter of
United States et al. v. AGP Corn Processing, Inc.


FOR U.S. ENVIRONMENTAL PROTECTION AGENCY:




Walker B. Smith                               Date  8/15/05
Director
Office of Civil Enforcement
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460




James B. Gulliford                            Date  7/11/05
Regional Administrator
U.S. Environmental Protection Agency
Region 7
901 North 5th Street
Kansas City, Kansas 66101




Martha R. Steincamp                           Date  7/20/05
Regional Counsel
U.S. Environmental Protection Agency
Region 7
901 North 5th Street
Kansas City, Kansas 66101



31

THE UNDERSIGNED enter into this Consent Decree in the matter of
United States et al. v. AGP Corn Processing, Inc.

UNITED STATES ATTORNEY

Michael G. Heavican
United States Attorney
District of Nebraska

By: _____        Date _____
    Laurie Kelley, Mass. Bar No. 557575
    Assistant United States Attorney
    District of Nebraska
    1620 Dodge Street, Suite 1400
    Omaha, Nebraska 68102-1506
    Telephone: 402-661-3700
    Fax: 402-661-3081

32

THE UNDERSIGNED enter into this Consent Decree in the matter of
United States et al. v. AGP Corn Processing, Inc.


FOR THE PLAINTIFF-INTERVENOR, THE STATE OF NEBRASKA DEPARTMENT OF
ENVIRONMENTAL QUALITY


Jodi M. Fenner, #220351
Assistant Attorney General
2115 State Capitol Building
Post Office Box 98920
Lincoln, Nebraska 68509-8920

Date 5/25/05


33

THE UNDERSIGNED enter into this Consent Decree in the matter of
United States et al. v. AGP Corn Processing, Inc.

FOR DEFENDANT, AGP:

_____                    Date 3/24/05
(Name), Title

**Martin P. Reagan**
**Chief Executive Officer**

34

# Control Technology Plan

# For

# AGP Corn Processing, Inc.

# Hastings, Nebraska

# Contents

1.0  Introduction......................................................................................... 1-1

2.0 Emission Units Requiring Pollution Control Equipment ..................................... 2-1

3.0 Engineering Design Criteria for Pollution Control Equipment............................. 3-1

4.0 Emission Limits From Pollution Control Equipment........................................... 4-1
    4.1 Alternative Operating Scenario...................................................................4-2

5.0 Pollution Control Equipment Installation Schedule..............................................5-1

6.0 Monitoring Parameters for Pollution Control Devices...........................................6-1

7.0 Pollution Control Device Performance Test Schedule and Test Methods Used ...7-1

8.0 Fugitive Dust Emission Control Program..............................................................8-1

# 1.0 INTRODUCTION

This Control Technology Plan (CTP) is an integral part of the Consent Decree and has been reviewed and approved by the United States Environmental Protection Agency (EPA) and the Nebraska Department of Environmental Quality (NDEQ) as part of the Consent Decree. This CTP contains:

a)  Identification of all units to be controlled;

b)  Engineering design criteria for all proposed controls capable of meeting the emission levels required by Part IV of the Consent Decree;

c)  Proposed short-term and long-term emission limits and controlled outlet concentrations for each pollutant as appropriate;

d)  · A schedule for expedited installation with specific milestones applicable on a unit-by-unit basis;

e)  Proposed monitoring parameters for all control equipment and parameter ranges to the extent that information is currently known;

f)  Identification of all units to be emission tested and a schedule for initial tests and retests;

g)  The test methods that will be used to demonstrate compliance with the emission levels set forth in the Consent Decree;

h)  Program for minimization of fugitive dust emissions from facility operations.

1

## 2.0  EMISSION UNITS REQUIRING POLLUTION CONTROL EQUIPMENT

The following emission units, fugitive sources, and control equipment have been designated as
affected units in the consent decree and have emission limits requiring pollution control
technology.

| Unit Description | Control Equipment Description |
|---|---|
| DDGS Dryers | Regenerative Thermal Oxidizer (RTO), (Group NOx emission cap) |
| Fermentation Units (including the Beer Well) | Water Scrubber Alternative Scenario: RTO |
| Distillation Unit (Miscellaneous process vent) | RTO |
| Boilers #1 and #2 | (Group NOx emission cap) |
| Cooling Cyclone | The DDGS dryers shall be equipped with air re-circulation |
| Railcar and Truck Ethanol Load out | Flare |
| Valves, Flanges, and Seal Fugitive Emissions | LDAR program under NSPS VV |
| Truck Traffic | Dust Control Program |

2

## 3.0 ENGINEERING DESIGN CRITERIA FOR POLLUTION CONTROL EQUIPMENT

Any deviation from the design criteria listed here shall be reported in the quarterly reports required under this Consent Decree. The specific design criteria listed here are preliminary and subject to change pending development of additional data. Changes to the requirements listed in the following table shall be considered non-material modifications under this Consent Decree, provided AGP obtains written approval of the change(s) from EPA and NDEQ.

| Process Description | Control Device Description | Operating Parameters |
|---|---|---|
| DDGS Dryers | Regenerative Thermal Oxidizer (RTO) | Design Fuel Input Rate: greater than 15 mmBTU/hr<br><br>Residence Time > 0.5 seconds in combustion chamber<br><br>Temperature: 1600 °F |
| Fermentation Units (including Beer Well) | Replace or Optimize Existing Water Scrubber | Gas Flow Rate: 5,000 to 6,000 DSCFM<br><br>Water Flowrate: 35 - 45 gpm<br><br>Pressure drop: 2 - 10 in. $H_2O$ |
| | Alternative Scenario: RTO | Design Fuel Input Rate: greater than 15 mmBTU/hr<br><br>Residence Time > 0.5 seconds in combustion chamber<br><br>Temperature: 1600 °F |
| Distillation Unit (Misc. Process Vent) | RTO | Design Fuel Input Rate: greater than 15 mmBTU/hr<br><br>Residence Time > 0.5 seconds in combustion chamber<br><br>Temperature: 1600 °F |
| Cooling Cyclone | The DDGS dryers shall be equipped with air re-circulation | not applicable |
| Railcar and Truck Ethanol Load out | Flare | Flame Detection |

## 4.0 EMISSION LIMITS FROM POLLUTION CONTROL EQUIPMENT

Unless otherwise stated, all controlled emission limitations (including operating parameter ranges and limits) apply at all times except during periods of previously planned startup and shutdown periods, and malfunctions as defined in 40 C.F.R. § 63.2. These startup and shutdown periods shall not exceed the minimum amount of time necessary for these events, and during these events, AGP shall minimize emissions to the greatest extent practicable. To the extent practical, startup and shutdown of pollution control technology systems will be performed during times when process equipment is also shut down for routine maintenance. AGP shall also control emissions during a malfunction event in a manner consistent with good air pollution control practice for minimizing emissions.

Any deviation from the requirements in 4.0 and/or 4.1 shall be reported in the quarterly reports and as required under other state and federal regulations.

| Process Description | Control Device Description | Pollutant | Emission Limit(s) |
|---|---|---|---|
| DDGS Dryers | Regenerative Thermal Oxidizer (RTO) | VOC | 95% reduction or $\leq$ 10 ppm |
| | | CO | 90% reduction or $\leq$ 100 ppm |
| | | $PM/PM_{10}$ | Test and set limit pursuant to this Consent Decree |
| | | NOx | Group NOx emission cap $\leq$ 86.9 TPY |
| Fermentation Units (including Beer Well) | Scrubber | VOC | 95% reduction or < 20 ppm |
| | Alternative Scenario: RTO | VOC | 95% reduction or < 10 ppm |
| Distillation Units (Misc. process vent) | RTO | VOC | 95% reduction or $\leq$ 10 ppm |
| Cooling Cyclone | The DDGS dryers shall be equipped with air re-circulation | $PM/PM_{10}$ and VOC | Test and set limit pursuant to this Consent Decree |
| Boiler #1 | Group NOx emission cap | NOx | Group NOx emission cap $\leq$ 86.9 TPY |

4

| Process Description | Control Device Description | Pollutant | Emission Limit(s) |
|---|---|---|---|
| Boiler #2 | Group NOx emission cap | NOx | Group NOx emission cap ≤ 86.9 TPY |
| Railcar and Truck Ethanol Load Out | Flare | VOC | 95% reduction |
| Source-wide Cap | | VOC, CO, NOx, SO2, and PM/PM$_{10}$ | 12-month rolling sum source-wide cap of 95 TPY. |

During the first 11 months of operation, the facility shall maintain the following source-wide emission limits in Tons Per Year:

| | Mo 1 | Mo 2 | Mo 3 | Mo 4 | Mo 5 | Mo 6 | Mo 7 | Mo 8 | Mo 9 | Mo 10 | Mo 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Source-wide VOC, CO, NOx, SO$_2$ and PM/PM$_{10}$ | 12 | 24 | 36 | 45 | 56 | 64 | 72 | 80 | 84 | 88 | 92 |

For the Group NOx emission cap established under the Consent Decree, compliance with the "12- month rolling sum" will be demonstrated during the first 11 months of operation based on the following schedule of limits.

| | Mo. 1 | Mo. 2 | Mo. 3 | Mo. 4 | Mo. 5 | Mo. 6 | Mo. 7 | Mo. 8 | Mo. 9 | Mo. 10 | Mo. 11 | Mo. 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Group NOx cap (tpy) | 11.9 | 23.9 | 35.9 | 43.5 | 51.8 | 58.5 | 66.8 | 73.5 | 77.7 | 81.1 | 85.2 | 86.9 |

Recordkeeping

Record fuel usage monthly for each unit subject to the Group NOx emission cap. Calculate the Group NOx emissions from the previous month and the Group NOx emissions from the previous 11 months (12 month rolling sum). Calculate the total 12 month rolling sum of NOx emissions from all units according to Equation 1 below:

$$\sum_{i=1}^{n} E_{ni} = \sum_{i=1}^{x} \left[ NG_{xi}(MMBtu/month) \times EF_x(lb \: / \: MMBtu) \times 0.0005(ton \: / \: lb) \right] \quad \textbf{equation 1}$$

where;

$x$ = number of units;

$n$ = number of months of interest;

$\sum_{i=1}^{n} E_{ni}$ = sum of monthly NOx emissions from unit x (tons/12 months);

$NGx_i$ = $i^{th}$ month natural gas usage of emission unit x (MMBtu/month); and

$EF_x$ = unit specific emission factor determination by stack testing.

When natural gas is used as a fuel source, $EF_x$ in equation 1 shall be determined by conducting unit specific stack testing on each unit. When distillate fuel oil number 2 is used as a fuel source, $EF_x$ shall equal 0.12 pounds of NOx per MMBtu of fuel or alternatively, $EF_x$ shall be determined by unit specific stack testing. If unit specific stack testing is conducted using fuel oil number 2, the results of the stack testing shall be used to determine the value of $EF_x$ in equation 1.

If AGP installs a CEMs to measure the NOx emissions from a unit in the Group NOx cap, AGP shall submit a plan within ninety (90) days for review and approval to EPA and NDEQ requesting the use of the CEM data to determine $E_{ni}$ in equation 1 for that unit. The plan shall include at a minimum, the types of CEMs that are installed, QA/QC procedures, and how missing data will be evaluated during CEMs downtime periods. Upon written approval by EPA and NDEQ, the CEMs data shall be used. AGP shall make all CEMs and process data available to EPA and NDEQ upon request.

6

## 4.1 ALTERNATIVE OPERATING SCENARIO

The control emissions limitations for the DDGS dryers do not apply during periods of RTO regeneration not to exceed 50 dryer operating hours per year. Individual RTO regeneration events shall be limited to no longer than 12 hours for each event. The production facility may continue to operate and produce wet cake during periods of dryer control device downtime.

7

## 5.0 POLLUTION CONTROL EQUIPMENT INSTALLATION SCHEDULE

AGP shall install, shake down, and start up the following air pollution control equipment (or optimize existing equipment) and begin complying with the emission limits required by Part V of the Consent Decree by the following dates:

| Unit Description | Control Equipment | Date |
|---|---|---|
| DDGS Dryers, | Regenerative Thermal Oxidizer (RTO) | 12 months after entry of the Consent Decree |
| Fermentation Units (including Beer Well) | Optimize or Replace Existing Water Scrubber | 6 months after entry of the Consent Decree |
| | Alternative Scenario: Re-route the exhaust from Fermentation scrubber to RTO | 12 months after entry of the Consent Decree |
| Distillation Unit (Misc. process vent) | Regenerative Thermal Oxidizer (RTO) | 12 months after entry of the Consent Decree |
| Cooling cyclone | Equip DDGS dryers with air re-circulation | 6 months after entry of the Consent Decree |
| Boiler #1 | Optimize or Replace Existing Low NOx Burners | 6 months after entry of the Consent Decree |
| Boiler #2 | Optimize or Replace Existing Low NOx Burners | 6 months after entry of the Consent Decree |
| Railcar and Truck Ethanol Load Out | Flare | 6 months after entry of the Consent Decree |
| Fugitive VOC | LDAR NSPS VV | Upon entry of the Consent Decree |
| Truck Traffic Fugitive Dust Program | Road Sweeper | Upon entry of the Consent Decree |

8

## 6.0 MONITORING PARAMETERS FOR POLLUTION CONTROL DEVICES

The Consent Decree requires that monitoring parameters be established for affected pollution control devices. Beginning no later than 60 days following startup of a control device described below, AGP agrees to the following monitoring parameters for each of the affected pollution control devices. All monitoring data collected above shall be recorded and maintained on-site. Any deviations of monitoring frequency, record keeping and range shall be reported in the quarterly reports and as required under other state and federal regulations. Changes to the requirements listed in the following table shall be considered non-material modifications under this Consent Decree, provided AGP obtains written approval of the change(s) from EPA and NDEQ.

| Control Device Description | Parameter Monitored | Operating Range | Monitoring Frequency |
|---|---|---|---|
| Regenerative Thermal Oxidizer | Operating Temperature | $\geq$ TBD[1] | Continuously[2] with low temperature alarm |
| Scrubbers | Liquid Flow Rate | $\geq$ 30 gpm | Continuously |
| | Pressure Drop | 2 to 10 inches of water column | Daily |
| Flare | Temperature | >1400 F | Continuously during ethanol truck loading |

[1] Value to be proposed by AGP and approved by EPA and NDEQ based on actual operating conditions at the time of the performance test.

[2] "Continuously" excludes those periods of time for such necessary actions as maintenance, repair, calibration, and replacement of monitoring equipment and/or components.

9

## 7.0 POLLUTION CONTROL DEVICE PERFORMANCE TEST SCHEDULE AND TEST METHODS USED

The following schedule and methods will be used to demonstrate compliance with the emission limits contained in this Control Technology Plan and the Consent Decree. AGP shall conduct the following performance testing pursuant to Paragraphs 18, 19 and 20 of the Consent Decree. The following tests shall be conducted annually unless specifically waived in writing by NDEQ and EPA. The measurement of total VOC mass emissions shall be conducted in accordance to version 1.6 of the August 2004 Midwest Scaling Protocol. Variations to the August 2004 Midwest Scaling Protocol will be allowed if agreed to by the parties.

| Emission Unit/Control Device | Pollutant(s) Tested | Test Method |
|---|---|---|
| DDGS dryers/RTO[1] (test inlet and outlet) | Total VOC, speciated VOCs, NOx, CO, PM/$PM_{10}$ | Method 1, 2, 3, 3A, or 3B, 4, 5/202, 7E, 10, 18 (using a Regionally and State approved EPA "as VOC mass" method and procedures) and 25, 25A or 320. |
| Fermentation Units (Including Beer Well)/Scrubber (test inlet and outlet)[1] | Total VOC, speciated VOCs | Method 1, 2, 3, 3A, or 3B, 4, 18 (using a Regionally and State approved EPA "as VOC mass" method and procedures) and 25, 25A or 320. |
| Fermentation Units (Including Beer Well)/Alternative Scenario: RTO (test inlet and outlet) | Total VOC, speciated VOCs | Method 1, 2, 3, 3A, or 3B, 4, 18 (using a Regionally and State approved EPA "as VOC mass" method and procedures) and 25, 25A or 320. |
| Distillation Unit (Misc. process vent)/RTO | Total VOC, speciated VOCs | Method 1, 2, 3, 3A, or 3B, 4, 18 (using a Regionally and State approved EPA "as VOC mass" method and procedures) and 25, 25A or 320. |
| Cooling Cyclone (outlet) | Total VOC, speciated VOCs, PM/$PM_{10}$ | Method 1, 2, 3, 3A, or 3B, 4, 5/202, 18 (using a Regionally and State approved EPA "as VOC mass" method and procedures) and 25, 25A or 320 |
| Boiler #1 and Boiler #2 | NOx and CO | Method 7E and 10 |
| Railcar and Truck Ethanol Load Out/Flare | VOCs and Visible Emissions | Per 40 CFR 60.18 for open flame flare. As applicable, Method 1, 2, 3, 3A, or 3B, 4, 18 (using a Regionally and State approved EPA "as VOC mass" method and procedures) and 25, 25A or 320 will be used for enclosed flame flare. |

[1]When any emission limit in the Consent Decree, expressed as ppm is met, only outlet testing is required.

10

## 8.0 FUGITIVE DUST EMISSION CONTROL PROGRAM

The objectives of the Fugitive Control Program are to prevent and minimize the release of avoidable fugitive emissions as required by the Consent Decree. The Program describes the procedure AGP will use to control emissions, to determine when emissions are at levels requiring corrective action, and to reduce excessive emissions to acceptable levels.

AGP has existing paved roads (all normal traffic routes) that are used for truck and car traffic at the ethanol plant. AGP will implement the following actions to minimize fugitive dust emissions:

1.   AGP will perform weekly visual inspections of the roads at the ethanol plant.

2.   AGP will document the inspection was performed and describe any corrective action taken.

3.   AGP will sweep roads within 48 hours of observation of fugitive emissions caused by truck traffic on the roads.

11